2009-1094. Mr. Bauer. Thank you, Your Honors. May it please the Court. There are three issues that I intend to address directly today. First was whether the District Court erred as a matter of law when it equated a term that said there's no patent license with a termination provision of that agreement. And that becomes the fundamental mistake that the Court made. The term said there is no patent license granted. The Court thought that if there was a patent, no patent license, the whole agreement would be terminated. Mr. Bauer, how about the question we asked you to be prepared to talk about, which is whether Harvard had to have been a plaintiff in this case? Yes, Your Honor. I am prepared to address that issue. I'm sure you're familiar with the cases, the Valpo case, with Waterman v. McKenzie. And the question is whether the patentee gave all substantial rights to an exclusive licensee such that the exclusive licensee could sue without joining the patentee. Right. So, Your Honor, there's one fact that was not in this record because this was not an issue that was appealed. And that is that in April 2007, there was an amendment to the Harvard Asymmetrics Agreement, which gave asymmetrics the exclusive right to enforce in all fields. So I'm not sure what triggered the Court's question. Well, the Harvard Asymmetrics Agreement has Harvard all over. It has control over sublicenses, a request to grant certain ones. It talks about meeting Harvard's goals, manufacturing the U.S., preservation of rights to Harvard, with respect to other… Section 8.6 says Harvard can sue if you don't.  Harvard has to approve a settlement, joint control of litigation. This is not a case where they licensed asymmetrics and basically said, well, we'll just keep a couple of things in case you go bankrupt. So, Your Honor, the Supreme Court said that, for standing, there has to be three essential rights. The right of exclusivity, we have, asymmetrics has the right of exclusivity, and with that amendment… So the key to all of that is, can you sue on your own? And how can you get around 8.6, which says Harvard can sue if you don't? Your Honor, that was actually addressed in the Vopel case. I think it was the Vopel case. And if I've got that one, no. There's no, this court has never said that there's a single term that's dispositive on whether you have the right to bring, whether you have standing. And I will say, I believe it's the Vopel, that you need to look at the intention of the parties, as well as the language of the agreement. And the question is, I'm sorry, not Vopel, it's Speedplay, where the court said that the fact that another party has the right to bring the case is essentially a non-important issue. It's because asymmetrics could have granted… But Harvard retained so many rights in this patent. I don't believe, Your Honor, that Harvard retained any more rights than you'll find in any of the other cases in which the court has found standing. So the rights that Harvard… Harvard reserves the right to supply biological materials to other institutions? Well, Your Honor, so we've got to get into the intent here. So in other words, they can violate the license by giving others the biological materials? Well, they can grant the patent license. They can sell the biological materials, but only in very limited instances for research purposes. I mean, even the biocare agreement itself. How do you have an exclusive license and another license? Well, Your Honor, I know that was in your letter request, how about that biocare thing. That doesn't go to standing. So the question of standing is, does asymmetrics have the right to bring the lawsuit? And I don't believe any of the cases that I've seen from this court dealt with where one licensee was suing another licensee. How does the right to step in if you don't apply to the FDA in time? Your Honor, there's no question that Harvard retains rights, but none of those rights are rights that go to the three essential rights that the Supreme Court addresses. You mentioned a couple of times this amendment. Are you saying that's not part of the record at all? Have you filed a motion to supplement the record? It is part of the record below. It hasn't been submitted to this appeals court because this wasn't an issue that was raised. How do we find it in the record below? I can submit that with the court's permission by letter. And what's it going to say that changes this? What it did, Your Honor, is it provided asymmetrics exclusive rights in all fields. The original agreement was exclusive rights in the diagnostic field where Harvard retained rights in the research field. Didn't you say something about it gave asymmetrics the right to bring suit? In all fields. And do you have a citation to where it is in the record or are you just going to have to get it for us later? Your Honor, I have a copy. It's in the record below. The way the parties worked is the only thing that went into the appendix were things that were briefed on the appeal. And so what we have here is a situation where this was an issue raised below. It was raised by the defendants in their answer. It was raised in their motion in the pleadings for summary judgment that there was insufficient standing. Is there any objection to the other side or is it being properly in the record below? It is in the record below. All right, then it could have been included in the appendix. It could have been. All right, then send it in with a brief letter. Let me ask you another question. If we could get past that. The issue we're looking at right now, this may be an odd way of looking at it, but it's a contract issue. Isn't there diversity jurisdiction? Even if for some reason that there is maybe not jurisdiction over patent or there's a theoretical construct there. We're looking at a contract cause of action. Diversity was pled and from reading it was kind of odd. We're not going to answer this, so that's admitted, I think. It's unusual. The answer was unusual. There are certain paragraphs where it just said we're not going to answer this at all. We don't have to answer it. It's not admit, not deny, just we're not going to answer. So I'm gathering that diversity of jurisdiction is admitted. If it's diversity in a contract cause of action, do we really have to be focusing on licensee, patent clauses? Your Honor, this is a patent infringement case. It was brought only as a patent infringement case. It was a patent infringement case with allegations of patent infringement. The answer, the defense, is patent license. So that's where the contract comes in. Right. And I guess my question is can we look at this and say this is a contract that we're now deciding. We do have jurisdiction because it's diversity. We really don't have to spend a lot of time off on the other issue. This isn't a contract action between Asymmetrics and BioCare. Harvard has the contract with BioCare. Harvard's not a party to this lawsuit. So we do then have to take a look and see if we've got jurisdiction under patent law. Absolutely, Your Honor. And it was addressed and raised below. Unfortunately, not by motion. BioCare never raised it as a motion. We don't have a record from the district court as to whether this had essentially all of the facts. It was argued during the hearing. The court asked whether Asymmetrics had jurisdiction. We addressed it squarely at the hearing, and then the case went on. So we have a problem here in that BioCare didn't raise it by motion. The court didn't have the full record below. But we still have to deal with it. We have to satisfy ourselves of our own jurisdiction. Your Honor, absolutely right. And you have the sua sponte right to raise it, and you have the right to look at it de novo. And unfortunately, we don't have a full record here because you don't have where the issue is the intent of the parties. We don't have that record of the intent of the parties because it wasn't raised below. And we didn't have Harvard participating in the hearing below to put its intent in. Well, the district court has found that Section 2.5 doesn't limit BioCare at all anyway. Address that point. So that goes to where I started, Your Honor. The issue with what the district court did was it concluded. So we have 2.5, which simply says 2.5 says there's no patent license granted here. But the know-how section includes everything, whether or not it's patentable, including things that are patentable, evidently. Your Honor, so there's a mistake, a significant mistake from the district court. It looked at that license definition that says know-how. But the paragraph, Section 1.1, defines know-how as what's shown in Appendix A of the agreement. The district court didn't go to Appendix A. Wait a minute, counsel. Doesn't know-how mean all information, methods and processes, techniques and data, whether or not patentable, which are disclosed to licensee by Harvard and which relate to biological materials? Exactly, Your Honor. And doesn't biological materials go back and basically cover everything, including know-how supplied in Appendix A? There's a few things it doesn't consider, and then it says licensed products, which are allowed to sell in 1.5, goes on to all the monoclonal antibodies made utilizing or incorporating some portion of the biological materials. So, Your Honor, you have to understand what this agreement is, or the basis. Harvard has standard agreements that parties enter into. So, in fact, in this case, there were four other license agreements with four other parties. Harvard enters into a standard agreement and then defines them specifically for various parties. If you look at exactly 1.1 that you're looking at, Your Honor, it talks about biological materials, are the materials a know-how supplied by Harvard? That's right, per-en, as identified on Appendix A attached to this agreement. That's the definition of what's granted. But Appendix A is just identifying biological materials. It's biological materials shall mean, da-da-da-da, as identified. And the know-how supplied. And the know-how supplied. The only information as identified. It's materials and know-how. There's a separate definition for know-how in 1.2, and then even a further reference to licensed products, which they're allowed to sell. Doesn't that broaden it out? You're trying to say this is a very limited little agreement, and it reads to me very broadly. And nowhere does it reference patents coming. Conceivably, if you have something filed, you would reference that, wouldn't you? And let people know that, of course, this doesn't cover the things for which we have a pending patent application. Except, Your Honor, this is not a patent license agreement. There's no patent license in this. Well, you just said it covers everything, whether patentable or not. No, it grants a license to the biological materials which were identified. If you look at 2.1. Which is the subject of other patents that weren't disclosed. Well, Your Honor, the record is that no one asked. These were sophisticated parties. The record is that no one asked if there's patents. You knew of BioCare's license. Harvard knew. You knew. We knew, and we entered into the agreement. And you still didn't enter into the agreement. That's right, Your Honor, because this agreement says there's no patent license. So why wasn't the district court correct in considering that BioCare either had an applied license or in interpreting the exclusion of patent license to existing patents? Because my time is running up here, Your Honor. Well, you at least entered it with the risk that it might be construed against you. It was entered with the understanding of this agreement. That's right, Your Honor, that there was a risk there. Harvard had been advising. The record is, and you have in here the record from Harvard telling Asymmetrics that BioCare did not have a patented license. Let me ask you a question on that. And I can't claim to be fully familiar with all of Massachusetts law,  and aren't you standing basically in the shoes of the drafter in this particular case against BioCare? And so if Harvard didn't craft it carefully enough, that's not BioCare's fault. Your Honor, ambiguity is construed against the drafter. So let's go and say, is there something ambiguous? I bet you've got ambiguity. If you don't have ambiguity, if it's clear, then BioCare wins, don't they? You've got to rely on ambiguity. Well, Your Honor, this is summary judgment, so we've got to keep in mind we're here by summary judgment. So if there's ambiguity, so let's start. It's a case for patent infringement. BioCare's defense is patent license. That means they need to show patent license. The agreement says there are no patent licenses granted, period. That's what brought the case. The agreement says no patent licenses. That language couldn't be any clearer. There's no patent available at the time, but everything patentable is granted in that same agreement. Well, know-how, but there's no evidence, no record of any know-how having been provided from Harbor. The know-how definition is the material, the processes, the techniques which are disclosed to licensee and which relate to biological materials. The license grant, the license grant 2.1, is a license to use biological materials. That's the license grant, to use the biological materials and to make, use, and sell licensed products. Are they selling anything that's not included in the licensed products? Your Honor, without the patent license, there's significant value in this agreement. So this goes back to the district court. There's a big mistake in the district court. The district court equated. Help me out. Is there anything that they are selling? Are you complaining about them selling that's not included in Paragraph 1.5? In 1.5? That's what they're selling. Monoclonal antibodies made using biological materials. But they're allowed to sell it, and they're told they can sell it 1.5, and that's what you're complaining about them selling. Why doesn't this control? Because they can sell to the extent there's no patent infringement. So let me make sure Your Honors understand. There's significant value to this agreement, with or without the patent. Their right to sell and to pay royalties extends as long as the product is sold. It isn't limited to the existence of subsequent patents. Your Honor, they have the license. They have the right to sell. This is a worldwide license, with or without patents. That's the mistake the district court made, Your Honors, and I'm trying to get that. The district court said that when the patent was issued, this turned into a termination. I think the mistake was that Harvard licensed the same property to two people, and asymmetrics was complicit in that. It knew about it. Harvard didn't license. It granted no patent license. It granted a license to the material, which it then patented and licensed to someone else. It's granted a license to the material. That license to the material is circumscribed by patents that issue. BioCare retains worldwide rights. It can sell this stuff anywhere in the world. Counsel, you're saying then that it would be proper and this court should support a construction that I could, for example, say here, I've got items X and all its technology. You can use it. And then file for a patent, give the patent to Judge Rader, and he'll say, sorry, I've got all your money, and you've only had it a day now. Too bad you lose. They paid $5,000 for this license. They're paying royalties, which Harvard's assumed. And then royalties. That's right. So, Your Honor, there's nothing inconsistent. It takes $5,000. Your Honor, there's nothing inconsistent with granting a product. So you're saying if I steal just a little bit of money from you, it's okay, but if it was a big butt of money, it would be less? No, Your Honor. No, Your Honor, but we're trying to put this into the context of what is this agreement. And remember, we're on summary judgment. You asked about ambiguity. The paragraph is clear on its face. The paragraph's clear on its face. Which paragraph? The paragraph that says no patent license is granted. There's no restriction in there in terms about future patents, past patents. But in terms of the totality of the agreement, which one has to look at, then that paragraph becomes ambiguous. And then you need to take evidence as to the intent of the parties. As soon as it becomes ambiguous, that's the issue here, Your Honor, for summary judgment. As soon as it's ambiguous, we're done. Mr. Powell, you've run well over your time. Thank you, Your Honor. You've asked a lot of questions. Let's hear from Mr. Otto, and we will give you your three minutes of rebuttal back. Thank you, Your Honor. And I suspect we may go over your time, too. But within reason, that's acceptable. Good morning, Your Honor. And we accepted the proper further information, and if you want to respond to that briefly in a couple-page letter, that's fine, too. Thank you. Do you agree, then, that actually that letter solved this problem, the question was raised? I don't agree, and I was conferring quietly with my associate as to whether it was in the record. We're not sure sitting here today. Well, if it is in the record, it doesn't solve the problem. No, it doesn't solve the problem. So you want the case to go back to the historian? I do, Your Honor, and here's why. I'm sorry, you do? I don't think it needs to be remanded, and I don't think Harvard is an indispensable party, and here's why. Regardless of how this case was styled on day one by asymmetrics, almost immediately, before the scheduling conference and at the scheduling conference, asymmetrics pronounced, this is a case for summary judgment. This is a contract case. We don't need claim construction. We don't need a marking hearing. The parties can move for summary judgment because the main of their case then and up until the day of summary judgment was, well, there's a scrivener's error. There's a scrivener's error in the field of use limitation, and once we fix that language, we asymmetrics will win. Asymmetrics can bring this case as a contract case. That doesn't mean they have standing. It doesn't mean they have rights of an indispensable third party or, rather, a third-party beneficiary. They lose on those. They're not good defenses, but it's not the same. It's not determinative of whether or not Harvard is an indispensable third party in this case, and it's by asymmetrics' own choice. It's why discovery was limited solely to contract issue. It's why discovery was taken only on matters of contract interpretation, extrinsic evidence. I'm missing some kind of byplay here, and I've got to ask. Asymmetrics lost in the court, and they seem to be arguing, no question, we've got jurisdiction. There's something in the record. Don't worry about it. We've got jurisdiction. Just overturn. You win in the trial court, and you seem to be arguing, no, maybe there's not jurisdiction. Maybe you should send it back. And I'm not understanding why you're fighting. You seem to be fighting very hard to make us go on our original thought that, gee, maybe this thing ought to go back to the trial court. What am I missing in this jurisdiction? We move to dismiss before your court. I understand, but what's the trap I'm missing? What went wrong? What trap is it that I'm missing that if we say yes, we have jurisdiction? How does that hurt you? We think you can decide this case on the contract merits that were decided at summary judgment. Yes, but if we think Hal had to have been a plaintiff, we can't decide the case on the merits, right, even if we could otherwise? Jurisdiction is jurisdiction. I agree. I'm not sure what the question is. Again, after summary judgment, we move to dismiss. The question is did Hal give asymmetrics all substantial rights to the patent, or did they retain sufficient rights such that they had to have been a co-plaintiff? I don't think they needed to be a co-plaintiff, Your Honor, and here's why. There are two non-exclusive biological use agreements. Biocare and asymmetrics each have them. Asymmetrics later acquired exclusive patent rights, but non-exclusive uses to the biological materials. So each party has that non-exclusive right to use the biological materials. But the patent rights to which it obtained an exclusive license dominate the use of the biological material to which you have a non-exclusive license. Dominate in what sense, Your Honor? The use and sale would infringe that patent. I don't agree with that prospect, Your Honor. Well, absent your agreement, let's say you didn't have your agreement, then would you agree that your use would infringe the patent? I wouldn't agree with that unless we knew more about how they were using the biological materials. Again, no claim construction in this case. We don't know, standing here today, whether anything— You don't want to waive anything. I understand that. But, Your Honor, we don't know whether anything Biocare has done would, barring the agreement, infringe— You don't have to waive it. Let me phrase the question differently. Let's assume Biocare doesn't have an agreement. With that new—the amendment that we've now heard about, is there any question that they could just bring a straight-on patent suit against you and there'd have to be claim interpretation and the whole bargain and so forth? Any issue at all of jurisdiction or anything else for that? You'd have to defend not on we've got a license, but on we don't infringe or it's invalid, right? I believe they could bring that patent case. Of course, if we hold that Harvard has to be a co-plaintiff, that puts Harvard in the position of being a co-plaintiff in a patent infringement suit where it is contractually obligated to assist Biocare, the defendant, in the defense of the suit. What a mess. I agree. You wrote a letter that you specifically referred not to the asymmetric agreement 8.1 and other sections, but 7.4 of the Biocare agreement. 7.4 does not include a mandate, as you know, as a cooperation clause. You know, there has been much said both in testimony and at oral argument and summary judgment, and you can see it riddled throughout the appendix, what Harvard's, you know, quote, position is in this case. And there's no question they want nothing to do with this case. They don't think they need to be involved. They've been under quite an extraordinary amount of pressure from asymmetrics and their founders, really since they learned of the Biocare agreement. You mean asymmetric founders, not John Harvard. Asymmetric founders, that's right. And, you know, without question, when you look at redacted minutes from meetings concerning asymmetrics and Harvard's counsel, and, gee, how can we find Biocare to somehow be in default and get you where you need to be, there's no question but that asymmetrics is exerting an extraordinary amount of undue influence over Harvard. Well, is it your position, then, that we can interpret this agreement on its four corners, within its four corners, and just as a matter of law decide what you have, and because of what you have, then that's a defense or a bar to them. You have the right to use these materials. They can't stop you. That's correct. No ambiguity. No ambiguity. And, by the way, throughout their briefing and at summary judgment, they pronounced, this is an unambiguous contract, okay? At summary judgment, I just want to make... Have you provided record references to that? Sure. Of course, we've got 2.5 here that says flat out the agreement doesn't license a U.S. patent. That's pretty explicit. Does not grant a license to patents in existence. It doesn't say that. It doesn't say that. It says include a license under any U.S. or foreign patents. That's correct. So no license. You don't have a license. When the patent comes out, why can't they sue you? Because at that point, Your Honor, given what has happened in the run-up to those licenses granted, it's biochar's position, and, of course, we agree with the lower court, as we argued, that they would then have an implied license to the patents. And the chronology, the timeline of events... Well, why are we going to an implied license when you have an explicit license here? Is there something in this explicit license? We believe we have an express license. Well, but you've got to get around that 2.5. How do you get around it? We think when you read 2.5 with the entirety of the agreement, and when you look at 2.5 with the other terms, what is included in the termination clause, meaning what's not included, the termination clause doesn't go to what happens when patents issues. And when you look at the definition of know-how, as the court discussed with counsel earlier, it supports a reading of 2.5 that the license is only limited by patents than in existence. A couple of other things... Well, let me ask you a question. Under Massachusetts law, which I think is what controls the contract issue, you have this statement. It doesn't include a license under any U.S. or foreign patents. Under Massachusetts law, if someone has entered into a contract, allowed post hoc, afterwards, unilaterally, to take actions which would somehow nullify or destroy the contract. Is there any cases along that line where you... Let's say I accept. They gave you these rights. They have that paragraph in there, and then they go out unilaterally and try to destroy your rights. After the patent. Right. And that's your position. They went ahead and got these patents, whether secretly or unsecretly. They tried to destroy your rights for these patents after taking your money. Only $5,000, counsel said. But where I come from, $5,000 is a lot. What's the status of the law in Massachusetts on that? Are they allowed to do that? No, they're not. The court referred to the Smart case and discussed the import of not being able to come in with later conditions subsequent to undo the bargain. A couple of things. We submitted a motion to strike certain portions. But you heard Mr. Bauer tell us that part of the bargain was not a license under any patent. Well, we're talking about— No, no, no, no, no, no. This is not a position to discuss what was negotiated for in 2002. And the case is clearly a turn on what was negotiated at point of agreement. And this would be back in 2002 with BioCare clearly soliciting— Well, if we're going to go into what was negotiated in intent, wouldn't we only get into that if there's some kind of— For you to retain the judgment you've got now, we have to decide this on the four corners of this document. We're not supposed to be looking at other evidence, parole evidence, intent, and all that kind of thing. Isn't that correct? I would agree. If you start going down that road, then we send it back to the court for more development, don't we? Yeah. I would agree. And I think the district court noted very well that looking at the extrinsic evidence in the case was not going to vary any of the essential terms of the agreement. Okay. Well, then looking just at this, how do you deal with, under these four corners, paragraph 2.5? You can see that's what the bottom— Sure. Well, in the four corners of the agreement, and looking at no other license agreements by comparison, as asymmetrics would have you do, clearly the termination clause is consistent with 2.5. Biocare can use these biological materials so long as it sells licensed products. There is no language in the termination clause that says once patent is issued, this agreement is terminated. Again, the reference to the know-how definition in 1.2 is entirely consistent with what rights are being granted in this agreement. It's certainly consistent with 2.5. And again, there are— and I'm staying within the four corners of the agreement. I won't go further. The trial court interpreted 2.5 in the light of the totality of the agreement as applying only to then-existing patents. That's where you ultimately rest your case. That's right. The asymmetrics, as you know, included references to other licensees when they added material to the joint appendix and in their reply. We, of course, had no opportunity to address those other licensees. But they help shed some light on what was being granted to Biocare and what the bargain for exchange was back when the license was granted. Those agreements are very different. Those agreements actually disclose pending patents by an addendum. Biocare's does not. Those agreements contain a cooperation paragraph to share information with scientists. The Biocare agreement does not. Those agreements don't have the know-how definition in them. The Biocare agreement does. Those agreements are clearly limited in use for research use only. The Biocare agreement is not. And Asymmetrics has pronounced it has no disagreement with that term any longer. It conceded that in summary judgment. So the court made a big deal of it, obviously, because it was a big feature of their summary judgment paper. So imagine everyone's surprise when, in summary judgment, Asymmetrics said, we don't have an issue with that. Let me ask. The final clause of the agreement, 7.12, is sometimes called incorporation or Mother Hubbard, or everything's rolled in, no other agreements. There's some issue in the record of Asymmetrics trying to bring up various emails that came from Harvard later. Under Massachusetts law, and as I understand Massachusetts law, you only hear written agreement. Oh, that brings up a good question. Is this a case under the UCC? Was this a sale of goods? I'm sorry. Well, never mind. Let's do one at a time. That's only fair. Any of those writings that came from Harvard later on, a written agreement that might have changed the terms of the contract? Not this contract, no. A written agreement or emails, I'm not sure. As I understand it, there's two or three communications from Harvard to BioCare after, that's how I read what was going on in the briefs, I may have misunderstood it, where they said you don't have a patent or some such thing like this. Is that sufficient under Massachusetts law to be a written agreement as referenced in 7.12? It is not, Your Honor. And the email that you're referring to was a year later when Harvard, at some insistence by asymmetrics, wrote to them and said, will you agree to an amendment restricting your use in Harvard? And BioCare said, thank you, no. A written agreement has to be assented to by both sides under the law? Absolutely not. There can't be a waiver by failure to respond. In other words, if Harvard says you don't have this because if BioCare doesn't respond under Massachusetts law, can that just be an implied acceptance or agreement of new terms? No, Your Honor, and BioCare did respond each time. All right. Nothing further, then we thank you, Mr. Votto. Thank you. Mr. Votto, we'll give you your three minutes rebuttal time. Really? Yes. You needn't take it all, but we'll give you it. Okay.  In terms of the amendment, Your Honor, that went to the field-of-use issue, which is not on appeal here. There had been two issues below. Again, we talk about just background. This was a standard Harvard agreement. It had a field-of-use limitation to the research field, and the evidence is that apparently they forgot to put the word field-of-use in the license grant. And so you have a license grant that doesn't have the field-of-use, which appears in the field-of-use definitions. Would you agree that the later communications a year later are not sufficient? I mean, I think I know what Massachusetts law is, but I'm asking because I assume you know it better than I do. Would you agree with counsel that the later communications do not wind up being a modification by written agreement as required by federal law? That's right, Your Honor. What we argued below, and that's not on appeal now, is that that field-of-use was a mistake and that it was clear from the agreement. You had a definition of field-of-use. Why was it there if not part of? We lost on that below. We haven't argued that one here. Regarding the issue of, Your Honor had asked about the fact that Harvard retained some rights on the standing issue. So the Speedplay case, Your Honor, actually is the quote that I was looking for. And in the Speedplay case, they very specifically, and now if I can grab it so quickly, Speedplay case talked about the right to sue where the patent owner retained the right to sue the infringer. That would be illusory, could be illusory. Remember, every one of these terms, this court's never said any single term is dispositive. You need to look at the whole picture. And where Harvard has a right to sue if we don't, but we can grant a royalty-free license, that was the Speedplay case. They said the fact that you can grant a royalty-free license makes that right of Harvard's illusory. So we need to look at all the issues. What we have here, Your Honor, is BioCare asking for two sides of the case. They raised the issue of standing below. Now they come here and say standing's not an issue. Now the fact is, Your Honors do get to look at it sui sponte. You get to look at it de novo. You need to look at the intent of the parties. You need a record. We don't have that. If there's an issue in Your Honor's minds as to standing, we need to vacate this decision, send it back. It allows us to add Harvard to the case. Harvard has a contractual obligation. It may come in involuntarily because it has to deal with both sides. It may not join. Harvard has an obligation to both parties. It has an obligation, so it needs to join the case and wrap all this up. But it's not a discretionary thing, as BioCare would say. Well, we won below, so no harm, no foul. So it's like an interpleader case. Harvard, that's right, Your Honor. Harvard would need to, I mean, there's so much here that goes to the intent of the parties. Well, let me ask you a question along that line. Federal Civil Procedure 1 says that we're to, or at least the district court is supposed to administer the rules, just, speedy, inexpensive. And these are three, I mean, Harvard has all the lawyers, some of the best lawyers in the world, if not the best, obviously. Both sides here... None of whom saw this contract. They may not have taken advantage when they were drafting the contract, but they obviously have access to it. Right. Both sides here are well represented. We don't have the little widower orphan appearing pro se. Anybody wanting to be in this, any three of them could raise any argument they would or could have. Why should we now be sending this case on back for another two, three years? Well, first of all, it wouldn't be that long. But second, I don't think that's a discretionary issue for you, Your Honors. If you don't have standing, you need to. We add Harvard. We get the record. And what that does, Your Honor, is because Judge Stearns made a significant set of findings based on Harvard's non-participation in terms of assumptions as to what Harvard might think. They've argued here a significant amount of evidence as to what Harvard did or didn't think. If Harvard's a necessary party, it needs to go back. Now, I'm not here arguing. I believe we had standing when we brought it. All I'm saying is it can't be. All I'm saying is if it needs to go back, it's a vacating of the decision, a remand, which allows us to add Harvard to the case. And now we have the full record. And it just don't get to flip and change. What could Harvard, adding Harvard, what could they possibly add to the case if we're going to decide this on the four corners of the contract? Well, Your Honor, if there's ambiguity. But that's it. Yes, once we decide ambiguity, then that's a given. Well, there's one last, and I will answer that. And that has to do with the implied license. So if you look at Judge Stern's decision, the entire part that relates to this is in the last two pages, where he says that he can't look at the patent license, 2.5, without seeing it as a termination. It allows Harvard to explain what that means. But on the implied license, Judge Stern says there's three elements that are necessary for implied license. And if you read his decision, he only finds on one of them. And that one is that biocare acquiesced. And you need to look for implied license as to other issues, as to whether there was misreliance. I don't think that implied license can stand on this record, because Judge Stern's didn't address them. Thank you, Mr. Powell. Thank you. That's the case. Well argued. Take it under advisement. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock.